UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **Catherine C. Hymel**, an individual, *Plaintiff*, v. **Allstate Insurance Company**, *Defendant*. | Case No.: 1:24-cv-01495 Honorable Virginia M. Kendall |

# PLAINTIFF CATHERINE C. HYMEL'S VERIFIED AMENDED COMPLAINT

Plaintiff Catherine C. Hymel ("**Plaintiff**" or "**Ms. Hymel**") brings this action against Defendant Allstate Insurance Company's ("**Defendant**" or "**Allstate**") for damages arising from Allstate's breach of contract, bad faith conduct, intentional interference with business relations, and unfair and deceptive trade practices.

## NATURE OF THE ACTION

1. This is a civil action for monetary damages based on Allstate's breach of the Allstate R3001 Exclusive Agency Agreement and its integrated documents (collectively, "**EA Agreement**"), which formed a valid contract between Ms. Hymel and Allstate.

2. Pursuant to the EA Agreement, Ms. Hymel owned an Allstate agency in the State of Louisiana.

3. Allstate breached the EA Agreement by exercising its discretion over the agency sale and contract termination in bad faith by discouraging and denying sales to qualified buyers and terminating Ms. Hymel's contract citing lack of production while she was trying to sell, contrary

**Verified Amended Complaint**

to her reasonable expectations under the contract.

4. Further, Allstate intentionally and unjustifiably interfered with Ms. Hymel's business relations and expectancy by refusing to communicate with prospective buyers, arbitrarily denying the sale to serious buyers, creating arbitrary conditions for sale to intentionally discourage prospective buyers, and telling a prospective buyer he would be given Ms. Hymel's book to discourage negotiations.

5. As a result of Allstate's breach of contract, bad faith conduct, intentional interference with business relations, and unfair and deceptive trade practices, Ms. Hymel has suffered substantial damages. By this action, Ms. Hymel seeks compensatory damages, punitive damages, attorneys' fees, and costs.

## JURISDICTION AND VENUE

6. This action arises under the common law of the State of Louisiana to redress contractual rights. The EA Agreement does not contain a choice-of-law provision. As this is a diversity action, the federal court must apply the choice-of-law rules of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494-496 (1941). Illinois, the forum state, follows the "most significant relationship" test of the Restatement (Second) of Conflict of Laws for contract and tort claims. *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 165, 879 N.E.2d 893, 904 (2007).

7. Under the most significant relationship test, Louisiana law governs this dispute. The most significant contacts are with the State of Louisiana: Ms. Hymel resided in Louisiana at all relevant times; her Allstate insurance agency was located in Louisiana; the alleged injuries, including Allstate's interference with the agency sale, occurred in Louisiana; and Allstate

**Verified Amended Complaint** 2

directed its conduct toward Ms. Hymel in Louisiana. These contacts outweigh any connections to Illinois, which are limited to Allstate's place of incorporation and principal place of business. Therefore, Louisiana law applies to Ms. Hymel's claims.

8. The Court has original subject matter jurisdiction under 28 U.S.C. § 1332(a) because the matter is between citizens of different States and the matter in controversy exceeds $75,000.

9. This Court has the authority to provide monetary damages under applicable Louisiana law.

10. This Court has personal jurisdiction over Defendant because it is a corporation domiciled in the State of Illinois or it has otherwise made and established contacts within the State to permit the exercise of personal jurisdiction over it.

11. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant resides in this district and is subject to this Court's personal jurisdiction under 28 U.S.C. § 1391(c)(1). Further, Defendant resides in Cook County, so venue is proper in this division of this district.

## PARTIES

12. Plaintiff Catherine C. Hymel was an EA who owned one Allstate Insurance Company agency in the State of Louisiana . At all relevant times, Ms. Hymel resided and worked in the State of Louisiana .

13. Defendant Allstate Insurance Company is incorporated in the State of Illinois and maintains its principal place of business in Northbrook, Illinois, which is in Cook County, Illinois. Allstate is a resident of the State of Illinois pursuant to 28 U.S.C. § 1391(c)(1).

**Verified Amended Complaint** 3

## PROCEDURAL HISTORY

14. On August 30, 2022, Plaintiffs, including Ms. Hymel, filed their First Amended Complaint alleging breaches of the Allstate R3001 Exclusive Agency Agreement and its integrated documents.

15. On October 17, 2022, Allstate moved to sever the claims of each of the individual plaintiffs. On August 4, 2023, Judge Sharon Johnson Coleman granted the motion to sever.

16. On February 22, 2024, the Northern District of Illinois Executive Committee ordered *Parson et al v. Allstate Insurance Company*, *No. 1:22-cv-03962* be severed. The case of *Catherine C. Hymel v. Allstate, No. 1:24-cv-014954,* has been reassigned to Judge Kendall.

17. On April 18, 2024, an initial status hearing was held via Webex before Judge Kendall. The Court ordered Ms. Hymel to amend her complaint by May 3, 2024. Allstate was given until May 24, 2024 to file a response to the amended complaint.

## FACTS

Ms. Hymel alleges as follows, upon information and belief, formed after an inquiry reasonable under the circumstances:

**I.    EA Agreement Generally**

18. Allstate EAs are independent contractors of Allstate who are authorized to sell insurance policies on behalf of Allstate in exchange for commission and building a valuable book of business. EAs are not permitted to sell insurance policies from other insurance companies. EA Agreement, Section I.E.

19. To become an EA with Allstate, all prospective EAs must enter into the EA Agreement with Allstate. These integrated documents include the Exclusive Agency Independent Contractor Manual ("**Manual**"), the Supplement for the R3001 Agreement ("**Supplement**"), and

**Verified Amended Complaint**                                                4

Exclusive Agency Independent Contractor Reference Guide ("**Guide**"). Copies of the EA Agreement and integrated documents are attached to this complaint as Exhibits 1-4. The executed EA Agreement between Allstate and an EA forms a valid contract under the laws of the State of Louisiana.

20. When an EA sells an Allstate insurance policy, the value of that policy becomes part of the EAs "book of business."

21. The express terms of the EA Agreement establish that EAs have an economic interest in the book of business created by the Independent Contractor relationship with Allstate, based on the EA Agreement. *See* Manual, pg 38.

## II. Agency Sales Under the EA Agreement

22. The right to sell the economic interest in the book of business is one of the most significant benefits to the EA.

23. The express contract terms of the EA Agreement specify that each EA's economic interest in the book of business includes the right for EAs to sell their economic interest to an approved buyer, or to receive a termination payment from Allstate, if vested:

> Subject to the terms and conditions set forth in the R3001 Agreement, the Supplement, and this Manual, you may transfer your economic interest in the business written under the R3000 and/or R3001 Agreement upon the termination of your agency relationship with Allstate by either:
>
> > 1. Selling your economic interest in the business to an approved buyer
> >
> > 2. Electing the termination payment.

*EA Independent Contractor Manual*, pg 38.

24. Upon termination of the EA agreement, an EA has 90 days to find an Allstate-approved buyer for their economic interest, reach an agreement with that buyer, and close the sale with that buyer. *See id*. at 32-38. If the agent does not sell his or her economic interest within that 90-day window, he or she will receive the termination payment ("**TPP**"),

**Verified Amended Complaint** 5

which is generally less than 50% of the sale value of the economic interest.

25. The EA Agreement also states multiple times that Allstate is allowed broad discretion in approving or denying sales, but emphasizes that Allstate is to have no involvement in an agency sale, except to approve or deny the sale.

> In sale of agency situations, Allstate is never the buyer or seller. The only times Allstate is involved is to approve the buyer and when you elect to receive the termination payment. If you elect to sell, you do not receive the termination payment from Allstate. It is your responsibility to establish a value and negotiate the sale price for your economic interest in any of the business included in the transfer.

*Id*. at 41.

### A. Agency Sales to Existing Exclusive Agents

26. Often, an existing EA will be the potential purchaser of a book of business, and the EA Agreement specifically contemplates this type of transaction. The Manual states that, "A qualified R3001 Agent may be approved as a buyer of your interest in the book of business serviced by your agency." *Id*. at 39.

27. The Manual also states that "[i]n order to be considered for a book purchase, the agent must meet the then current qualifications established by [Allstate]." While sales of a book of business are subject to Allstate's approval based on whether the buyer is qualified, Allstate sets out objective criteria to evaluate whether a existing EA buyer is qualified. *See id*. at 39-40.

28. This list of objective qualifications gives EAs a reasonable expectation under the EA Agreement that Allstate will at least consider a potential buyer of the selling EA's book of business if that existing buyer meets the objective qualifications.

### III. Allstate's Interference in the Sale of Ms. Hymel's Agency

29. Ms. Hymel initiated training to become an Allstate agent on or about March 29, 1989. At or around that date, Ms. Hymel purchased an Allstate agency in Metairie, Louisiana.

**Verified Amended Complaint**          6

### A. Field Sales Leader Doug Caminita pressures Ms. Hymel to sell her agency.

30. In or around 2018, Ms. Hymel, then aged sixty-one, expressed to Field Sales Leader ("**FSL**"), Doug Caminita ("**FSL Caminita**"), that she intended to retire at the age of sixty-five.

31. Shortly hereafter, FSL Caminita tried to convince Ms. Hymel to sell her agency to another Allstate agent, Glenn Liuza (**"Mr. Liuza"**), despite Ms. Hymel being four years from her intended retirement age.

32. Despite FSL Caminita's efforts, the sale did not go through as Mr. Liuza stated that he was not in the market to purchase another agency.

33. In or around 2019, Ms. Hymel's FSL Caminita again attempted to convince Ms. Hymel to sell her agency, this time to Gina Molinar ("**Ms. Molinar**").

34. FSL Caminita led Ms. Hymel to believe that Ms. Molinar had experience selling insurance with State Farm, but Ms. Hymel later learned that Ms. Molinar was unlicensed, had no insurance sales background, and was currently employed in the human resources department at State Farm.

35. Ms. Hymel also learned that Ms. Molinar was FSL Caminita's girlfriend.

36. Given Ms. Molinar's lack of experience, Ms. Hymel was hesitant to sell as Ms. Hymel's objective in completing the sale of her agency was to ensure that her clients, some of whom had been with her for many years, remained with a competent and experienced agent.

37. Despite Ms. Hymel expressing to FSL Caminita these valid concerns, FSL Caminita continued to pressure Ms. Hymel to sell the agency to Ms. Molinar, to the point his behavior was unprofessional and bordered on harassment.

38. After Ms. Hymel formally declined to sell her agency to Ms. Molinar, FSL Caminita's attitude towards Ms. Hymel became increasingly dismissive and toxic; FSL Caminita

refused to answer Ms. Hymel's call and emails, and blatantly ignored her at work meetings in front of other colleagues.

39. FSL Caminita's behavior towards Ms. Hymel was noticeable to the point that other colleagues asked Ms. Hymel what she did to "piss off" FSL Caminita.

### B. Ms. Hymel lists her agency for sale and receives several competent offers.

40. In February of 2020, Ms. Hymel listed her agency for sale.

41. On or about May 8, 2020, Lee Fritze ("**Mr. Fritze**"), an agent with fifteen years experience and appropriate licensing, submitted an oral offer to purchase Ms. Hymel's agency for $420,000, provided Ms. Hymel agreed to continue working for six months after the purchase to ease the transfer of ownership.

42. Ms. Hymel and Mr. Fritz were working with FSL Codie Cavalier ("**FSL Cavalier**") to complete the sale when FSL Cavalier suddenly left Allstate.

43. Ms. Hymel contacted FSL Caminiti to complete the sale, but FSL Caminiti refused to assist with the approval process or otherwise facilitate the sale to Mr. Fritze.

44. Upon information and belief, FSL Caminiti was incentivized to block the transaction as he would not have received a $5,000 bonus if the sale to Mr. Fritze was approved and processed because FSL Cavalier had already onboarded Mr. Fritze to Allstate.

45. Ms. Hymel then contacted Allstate management directly to determine how to complete the sale of her agency to Mr. Fritze.

46. Specifically, Ms. Hymel spoke with Allstate National Agency Establishment Coordinator Sherrick White ("**Mr. White**") and explained that Mr. Fritze was highly qualified and would be an asset to Allstate.

47. Mr. White stated that he would reach out to FSL Caminiti to complete the sale but neither Mr. Fritze nor Ms. Hymel ever heard from Mr. White or FSL Caminiti regarding the sale.

48. Because neither FSL Caminiti nor any other Allstate representative, including Mr. White, ever contacted Mr. Fritze, Mr. Fritze withdrew his verbal offer to purchase Ms. Hymel's agency.

49. On or around June 1, 2020, FSL Caminiti demanded that Ms. Hymel provide him with confidential information related to Ms. Hymel's broker compensation figures.

50. Upon information and belief, FSL Caminiti was prohibited from asking about this information as it was unrelated to Ms. Hymel's Allstate business.

51. On or about September 14, 2020, Allstate agent Megan Dodge ("**Ms. Dodge**") submitted an offer in writing to purchase Ms. Hymel's agency for $420,000.

52. Upon information and belief, Allstate required that all new agents complete the Series 6 license within eighteen months of their respective dates of hire but allowed extensions due to the ongoing COVID-19 pandemic. Ms. Dodge was informed she failed the Series 6 licensing test and so was not approved to purchase Ms. Hymel's agency.

53. Upon information and belief, Allstate later permitted Ms. Dodge to purchase a different Allstate agent's book and dropped the Series 6 licensing requirement.

54. On or around September 28, 2020, Jenny Vanderpool ("**Ms. Vanderpool**") from the Allstate National Establishment Team sent Ms. Hymel a contract for her signature to complete the sale of Ms. Hymel's agency to Tanisha Evans ("**Ms. Evans**.")

55. Ms. Hymel called Ms. Vanderpool to advise that a mistake had been made as she had never heard of Ms. Evans, and so had never negotiated the sale of Ms. Hymel's agency to Ms. Evans.

        **C.**        **Allstate sends Ms. Hymel's a ninety-day notice of termination of the contract for her Allstate agency.**

56. On or around December of 2020, Allstate sent Ms. Hymel a ninety-day notice of termination of the contract for Ms. Hymel's agency, citing lack of production, and informed her

**Verified Amended Complaint**        9

that she had ninety days to sell her agency.

57. Ms. Hymel had not sold policies throughout 2020 because she was selling her agency.

58. Scott Stephens ("**Mr. Stephens**") contacted Ms. Hymel about her purchasing her agency.

59. Ms. Hymel informed FSL Caminiti of Mr. Stephens' interest in her agency, but FSL Caminiti never contacted Mr. Stephens and instead dismissed Mr. Stephens as a potential buyer and told Ms. Hymel that "we don't want him" without further explanation.

60. Agents Tabitha D'Aribba ("**Ms. D'Aribba**") and Beau Boudreau ("**Mr. Boudreau**") expressed interest in each purchasing half of Ms. Hymel's agency and dividing her book of business between them.

61. Ms. D'Aribba and Mr. Boudreau were both Allstate-trained, had started scratch agencies, and had over eighteen months of experience with Allstate and three years of experience with State Farm.

62. FSL Caminiti refused to entertain allowing Ms. D'Aribba and Mr. Boudreau to divide the book of business because they were too "new" of agents and denied the sale.

63. FSL Caminiti brought Jon Jackel ("**Mr. Jackel**") as a potential buyer to Ms. Hymel but subsequently refused to approve the sale to Mr. Jackel until Mr. Jackel obtained his property and casualty license.

64. Mr. Jackel did obtain this licensing, yet FSL Caminiti never notified Ms. Hymel that Mr. Jackel was now qualified and instead told Ms. Hymel it was time to pursue other buyers.

65. FSL Caminiti then brought Mr. Jackel as a potential buyer to another Allstate agent, whose book Mr. Jackel eventually purchased.

66. On or around February 15, 2021, Allstate agent Shawn Coffey ("**Mr. Coffey**") offered Ms. Hymel $382,000 in cash for her agency. Ms. Hymel sent the offer that FSL Caminiti

**Verified Amended Complaint** 10

and Allstate Agency Manager Dallas Owen ("**Manager Owen**") and received approval.

67. The next day, on or around February 16, 2021, Manager Owen and FSL Caminiti called Mr. Coffey and informed him that they would not approve the sale unless he agreed to keep the physical office location open, after which Mr. Coffey withdrew his offer.

68. FSL Rhonda Murdock ("**FSL Murdock**") then referred Kenya Morgan ("Ms. Morgan") to Ms. Hymel as a potential buyer.

69. Upon information and belief, Ms. Morgan was at the time employed in retail clothing sales, had no experience in the insurance industry, and stated she did not have the money to purchase Ms. Hymel's agency, but that FSL Murdock would assist her with the process.

70. Ms. Hymel was hesitant to consider Ms. Morgan as a serious buyer in light of her inexperience, but since she had been referred by FSL Murdock, scheduled a meeting with Ms. Morgan, to which Ms. Morgan never showed up.

### D. Allstate notifies another agent that he would receive Ms. Hymel's book of business following her termination.

71. Agent Adam Levenway ("**Mr. Levenway**") told Ms. Hymel he was interested in purchasing Ms. Hymel's agency, but then abruptly stopped returning Ms. Hymel's calls.

72. Upon information and belief, at least three weeks before Ms. Hymel's ninety-day window to sell her agency expired, Allstate informed Mr. Levenway that Allstate would be giving Ms. Hymel's book of business to Mr. Levenway free of charge, leading to Mr. Levenway purposely evaded Ms. Hymel as he knew he would receive Ms. Hymel's book of business without needing to purchase Ms. Hymel's interest in it.

73. Ten days before the expiration of the ninety-day period, Allstate gave Ms. Hymel's book of business to Mr. Levenway.

74. Like prospective buyer Mr. Coffey, Mr. Levenway had another Allstate location approximately six to eight blocks from Ms. Hymel's agency office, yet FSL Caminiti and

**Verified Amended Complaint**                 11

Manager Owen allowed Mr. Levenway to close the physical office of Ms. Hymel's agency, despite previously informing Mr. Coffey that he would have to keep the physical office open as a condition of the sale.

> E. **Allstate arbitrarily requires Ms. Hymel to incur additional costs to implement AAV days before her office closure.**

75. On or around February of 2021, Allstate began utilizing a new telephone system, Allstate Agency Voice ("**AAV**").

76. Upon information and belief, Allstate estimated it would take approximately one year for all Allstate agents in Louisiana to onboard with the new system.

77. Because Ms. Hymel's office was closing within two weeks, the administrator of the telephone system agreed to postpone implementing the new system at Ms. Hymel's office so that she could close the office without onboarding.

78. FSL Caminiti overrode this decision and insisted that Ms. Hymel's office be equipped with the new system, which caused Ms. Hymel to pay additional costs and closed access to her computer, even though her agency closed only days later.

79. Upon information and belief, other agents in the area were not required to get the AAV system for as long as six months later.

> F. **Allstate terminates Ms. Hymel's contract.**

80. .On or around February 28, 2021, Allstate terminated Ms. Hymel's contract for her agency and the ninety-day period to sell her agency expired.

81. Because Ms. Hymel had not sold her book of business, she was forced to accept TPP.

82. Throughout the ninety-day period prior to her termination, Ms. Hymel had at least seven serious potential agents interested in purchasing her agency.

83. Upon information and belief, Allstate, through FSL Caminiti and FSL Murdock,

denied qualified, competent buyers to meet hiring quotes.

84. The market value of Ms. Hymel's book of business was valued at $420,000 based upon commonly accepted agency valuation techniques.

85. Instead of receiving proceeds from the sale of the book, Ms. Hymel was forced to accept TPP in the amount of $148,000, which was approximately $272,000 less than the proceeds from the sale of the book.

86. As a result of Allstate's interference in potential sales, Ms. Hymel suffered damages in excess of $272,000.

## COUNT I:

## Breach of Contract

87. Ms. Hymel realleges and incorporates by reference paragraphs 1 through 86.

88. In order to state a cause of action for breach of contract, a plaintiff must plead: (1) formation of a contract; (2) breach of the contract; and (3) damages as a direct result of the breach. *Fireman's Fund Insurance Co., v. R.S. Homes, LLC*, 294 So.3d 54, 59 (La. App. 4 Cir. 3/25/20).

89. The EA Agreement at issue in this matter is a valid and enforceable contract in whole or in part.

90. Ms. Hymel performed under the terms of the EA Agreement by selling insurance according to the terms of this contract and building a valuable book of business.

91. Allstate breached the EA Agreement by: refusing to communicate with serious buyers Lee Fritze and Scott Stephens; arbitrarily denying the sale to agent Megan Dodge and then later allowing Megan Dodge to purchase another agency; telling Ms. Hymel potential buyer Jon Jackel was not qualified, then later facilitating the sale of another agency to John Jackel; arbitrarily requiring potential buyer Shawn Coffey to keep Ms. Hymel's physical office open, resulting in Shawn Coffey withdrawing from negotiations, then later allowing the agent who

**Verified Amended Complaint** 13

received Ms. Hymel's book to close the agency; and informing prospective buyer Adam Levenway that he would be receiving Ms. Hymel's book after her termination, resulting in him ceasing negotiations with Ms. Hymel, thereby preventing Ms. Hymel from receiving fair market value for her economic interest.

92. Allstate's breach of the EA Agreement by interfering in Ms. Hymel's negotiations for the sale of her agency prevented Ms. Hymel from selling her agency at fair market value, resulting in substantial damages.

93. As a direct and proximate result of Allstate's breaches of contract, Ms. Hymel incurred economic losses in excess of $272,000.

## COUNT 2:

**Breach of the Implied Covenant of Good Faith and Fair Dealing based on Defendant's Interference in the Sale of Plaintiff's Agency**

94. Ms. Hymel realleges and incorporates by reference paragraphs 1 through 93.

95. There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. *Wooten v. Central Mutual Ins. Co.*, 166 So.2d 747 (La. App. 3d Cir. 1964).

96. Per the EA Agreement in this case, Allstate had sole contractual discretion to approve or reject a buyer of Ms. Hymel's agency.

97. Allstate, the party vested with discretion under the EA Agreement to approve the sale of Ms. Hymel's economic interest, owed Ms. Hymel a duty to act in good faith in deciding whether to approve the sale of Ms. Hymel's economic interest in her business.

98. Ms. Hymel had a reasonable expectation that Allstate would not arbitrarily or intentionally interfere with the sale of Ms. Hymel's agency to a qualified buyer.

99. Ms. Hymel also had a reasonable expectation that Allstate would approve the sale of Ms. Hymel's economic interest in her book of business to a qualified buyer.

100. Allstate breached the implied covenant of good faith and fair dealing by: misleading and pressuring Ms. Hymel to sell her agency to an inexperienced individual in Gina Molinari; refusing to communicate with serious buyers Lee Fritze and Scott Stephens; arbitrarily denying the sale to agent Megan Dodge and then later allowing Megan Dodge to purchase another agency; attempting to complete a sale to Tanisha Evans without Ms. Hymel being part of negotiations; telling Ms. Hymel potential buyer Jon Jackel was not qualified, then later facilitating the sale of another agency to John Jackel; arbitrarily requiring potential buyer Shawn Coffey to keep Ms. Hymel's physical office open, resulting in Shawn Coffey withdrawing from negotiations, then later allowing the agent who received Ms. Hymel's book to close the agency; informing prospective buyer Adam Levenway that he would be receiving Ms. Hymel's book after her termination, resulting in him ceasing negotiations with Ms. Hymel; terminating Ms. Hymel's contract while she was trying to sell; and arbitrarily requiring Ms. Hymel to incur additional and unnecessary costs of implementing AAV days before her termination and office closure.

101. Regarding the interference in the sale of Ms. Hymel's agency to qualified buyers, Allstate took action that was arbitrary and capricious and caused significant harm to Ms. Hymel, contrary to her reasonable expectations under the contract.

102. As a direct and proximate result of Allstate's breach of the implied covenant of good faith and fair dealing, Ms. Hymel suffered damages in excess of $272,000.

## COUNT 3:

### Intentional Interference with Business Relations

103. Ms. Hymel realleges and incorporates by reference paragraphs 1 through 102.

104. To state a claim for tortious interference with business relations under Louisiana law, a plaintiff must allege that defendant improperly influenced others not to deal with the plaintiff. *Junior Money Bags, Ltd. v. Segal*, 970 F. 2d 1 (5th Cir. 1992); *see also* La. Civ. Code art. 2315 ("Every act whatever of man that causes damage to another obliges him by whose fault

it happened to repair it.") Louisiana law protects the business person from "malicious and wanton interference." *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594 (U.S. Court of Appeals, 5th Cir. 1981).

105. Ms. Hymel had a valid business relation and well-founded expectancy in the advantageous sale of her agency to at least seven qualified buyers, including Lee Fritze, Tabitha D'Aribba, Beau Boudreau, Megan Dodge, Jon Jackel, Shawn Coffey, and Adam Levenway.

106. Upon information and belief, Allstate, through FSL Caminiti, maliciously retaliated against Ms. Hymel for not selling her agency to FSL's Caminiti's girlfriend, Gina Molinari, by intentional discouraging and denying the sale of Ms. Hymel's agency to other qualified buyers.

107. Allstate, through its employees FSL Caminiti, FSL Murdock, and Mr. White, and other leadership, had actual knowledge of Ms. Hymel's advantageous business relation and expectancy with respect to selling the agency to the above-referenced qualified prospective buyers.

108. Allstate, by and through the acts of its employees, intentionally and unjustifiably interfered with Ms. Hymel's business relation and expectancy by refusing to communicate with prospective buyers, arbitrarily denying the sale to serious buyers, creating arbitrary conditions for sale to intentionally discourage prospective buyers, and telling a prospective buyer he would be given Ms. Hymel's book to discourage negotiations.

109. Allstate's intentional and unjustified interference induced and caused the termination of Ms. Hymel's business relation and expectancy with qualified buyers, including Lee Fritze, Tabitha D'Aribba, Beau Boudreau, Megan Dodge, Jon Jackel, Shawn Coffey, and Adam Levenway.

110. As a direct and proximate result, Ms. Hymel was deprived of the proceeds from the expected sale.

111. As a direct and proximate result of Allstate's intentional interference with prospective economic advantage, Ms. Hymel suffered damages in excess of $272,0

## COUNT 4:

## Unfair and Deceptive Trade Practices

112. Ms. Hymel realleges and incorporates by reference paragraphs 1 through 111.

113. The Louisiana Unfair Trade Practices Act (LUPTA) prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. R.S. 51:1401 et seq. Any person who suffers an ascertainable loss may bring an action to recover actual damages. *Id*. If the violation was knowing, the court may award treble damages. *Id*.

114. The express contract terms of the EA Agreement specify that each EA's economic interest in the book of business includes the right for EAs to sell their economic interest to an approved buyer, yet Allstate interfered in the sale of Ms. Hymel's agency by refusing to communicate with prospective buyers, arbitrarily denying the sale to serious buyers, creating arbitrary conditions for sale to intentionally discourage prospective buyers, and telling a prospective buyer he would be given Ms. Hymel's book to discourage negotiations.

115. This conduct by Allstate was in or affecting commerce, as it involved the sale of an insurance book of business.

116. This conduct by Allstate caused injury to Ms. Hymel as she was forced to accept TPP in an amount substantially less than the value of her economic interest in her agency.

117. As a direct and proximate result of Allstate's unfair and deceptive trade practices, Ms. Hymel suffered damages in excess of $272,000.

**Verified Amended Complaint**          17

## RELATION BACK OF AMENDMENTS

118. The claims and allegations set forth in this Amended Complaint arise out of the same conduct, transactions, and occurrences set forth in Plaintiff's original pleading. This Amended Complaint merely adds new theories of recovery based on the same operative facts alleged in the original Complaint.

119. The Federal Rules of Civil Procedure explicitly address the relation back of amendments in Rule 15(c), which outlines the circumstances under which an amendment to a pleading relates back to the date of the original pleading. According to Rule 15(c), an amendment relates back when it asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading, among other specified conditions.

120. In this diversity case, where Louisiana substantive law applies, the relation back of amendments is governed by Louisiana law pursuant to the *Erie* doctrine. Louisiana's relation back rule is found in La. Code Civ. Proc. art. 1153, which provides that an amendment relates back to the date of the original pleading when the action or defense asserted in the amended petition arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.

121. Allstate was placed on sufficient notice of the factual allegations underlying Ms. Hymel's claims for tortious interference in business relations and unfair and deceptive trade practices in the original First Amended Complaint detailing Allstate's termination of Ms. Hymel's contract and interference in the sale of Ms. Hymel's agency.

122. The new claims asserted in this Amended Complaint relate back to the date of the original pleading, August 30, 2022, and are not time-barred because they arise from the same conduct, transactions, and occurrences set forth in the original Complaint, as provided by both Federal Rule of Civil Procedure 15(c) and 12 O.S. § 2015(C)(2).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

1. For actual damages in an amount to be proven;

2. For general, consequential, and incidental damages in an amount to be proven;

3. For punitive damages;

4. For pre-judgment interest at the legal rate;

5. For reasonable attorneys' fees, costs of suit, and out of pocket litigation expenses; and

6. For such other and further relief as the Court deems just and proper under the circumstances.

Dated: May 3, 2024　　　　　　　　　　　　Respectfully submitted,

/s/ James Bopp, Jr.
　James Bopp, Jr., Ind. Bar No. 2838-84*
*Lead Counsel for Plaintiff*
Melena S. Siebert, Ind. Bar No. 35061-15*
Cassandra R. Dougherty, Cal. Bar No. 336487*
Taylor C. Shetina, Ind. Bar. No. 37887-45*
THE BOPP LAW FIRM, PC
*The National Building*
1 South Sixth Street
Terre Haute, IN 47807-3510
Telephone: (812) 232-2434
Facsimile: (812) 235-3685
jboppjr@aol.com
msiebert@bopplaw.com
cdougherty@bopplaw.com
tshetina@bopplaw.com
* Admitted *pro hac vice*

**Verified Amended Complaint**　　　　　　19

## Certificate of Service

I hereby certify that on May 3, 2024, a copy of the foregoing and all attachments thereto was filed electronically using the Court's electronic filing system and served by email upon:

Jack Theis
Ariel Wilson
AWilson@rshc-law.com
JTheis@rshc-law.com
Riley Safer Holmes & Cancila LLP
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602

/s/ Cassandra R. Dougherty
Cassandra R. Dougherty
*Counsel for Plaintiff*

**Verified Amended Complaint** 20